# IN THE COURT OF APPEALS OF IOWA

No. 17-1098
Filed November 8, 2017

**IN THE INTEREST OF T.A. and D.A.,**
**Minor Children,**

**M.A., Father,**
 Appellant.

_____

Appeal from the Iowa District Court for Decatur County, Monty W. Franklin, District Associate Judge.

A father appeals from the adjudication of his children as children in need of assistance. **REVERSED.**

Bryan J. Tingle of Tingle Law Office, Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Carol A. Clark, Lamoni, for minor children.

Heard by Danilson, C.J., and Tabor and McDonald, JJ.

**DANILSON, Chief Judge.**

A father, M.A., appeals from the adjudication of his children—T.A., age ten, and D.A., age six—as children in need of assistance (CINA). Both children were adjudicated CINA pursuant to Iowa Code section 232.2(6)(c)(2) (2017), and T.A. was also adjudicated under section 232.2(6)(d). M.A. contends there is not clear and convincing evidence supporting the grounds for adjudication. Because we find there is insufficient evidence under either ground, we reverse.

**I. Background Facts & Proceedings.**

This is a case first initiated by T.A. and D.A.'s thirteen-year-old half-sibling, S.H., who made allegations of sexual contact alleged to have been committed by M.A., her step-father. If the allegations are supported by clear and convincing evidence, the acts would clearly support a CINA adjudication of both T.A. and D.A. The question we face is whether the evidence is sufficient to support the adjudication in light of both the evidence detracting from the truthfulness of the allegations and the very limited record relied upon by the State. Although S.H. and T.A. underwent a forensic interview, no recordings or transcripts of the interviews were admitted into evidence, and neither the children nor the interviewer testified.

In February 2017, S.H. reported that M.A. had subjected S.H. to sexual contact. S.H. also reported T.A. had written a note to S.H. revealing T.A. had also been touched inappropriately by M.A. According to testimony by the child protective worker, in an interview with a forensic interviewer at the Child Protection Center (CPC), S.H. reported M.A. asked her on occasion to show him her "bad spots" in order to get things in return. For example, S.H. stated M.A.

would sometimes take her driving and request to see her "bad spots" before he allowed her to drive the vehicle. S.H. also reported M.A. touched her "bad spots" on more than one occasion. S.H. recalled a specific incident when she and M.A. were in the family's detached garage and M.A. touched her. S.H. stated she reported the abuse to the mother the previous summer, but M.A. denied the abuse when confronted and no further actions were taken.

When initially asked by the child protective worker, T.A. stated M.A. had not touched her inappropriately. However, a week later during her interview at the CPC, T.A. reported M.A. told her to go into the bathroom on more than one occasion, remove her clothes, and lie down. T.A. stated M.A. would then get on top of her and his body would be shaking. T.A. described one occasion when she was playing a game and M.A. asked her to go to the bathroom and remove her clothing. She recalled the specific pajamas she was wearing. T.A. stated M.A. told her to lie down on the floor and he kissed her "privates." T.A. stated she told S.H. about the incident by writing her a note.

If these allegations by S.H. and T. A. were supported by substantial evidence, there would be support for the CINA adjudication of the children. But the record also contains significant evidence detracting from the credibility of S.H. and T.A.'s allegations.

First, when initially interviewed by the child protective worker, T.A. reported she had not been subjected to sexual contact by M.A. But because S.H. told the child protective worker that T.A. was also abused, one week later both children were required to undergo a forensic interview. It was not until the CPC interview that T.A. reported sexual contact. Sometime during that one-

week period, S.H. and T.A. spoke together. The child protective worker testified at the adjudication hearing that when asked by the forensic interviewer T.A. acknowledged she had talked to S.H. about the allegations of abuse prior to the interview. But S.H. denied talking to T.A. when asked the same question by the forensic interviewer.

The mother explained at the adjudication hearing that S.H. has been untruthful in the past, particularly when she is angry or in trouble. For example, S.H. made a prior allegation of physical abuse by the grandmother, alleging the grandmother made S.H. wear a shock collar. The allegation was ultimately determined to be unfounded after S.H. recanted.

In the summer of 2016, S.H. also levied a complaint to her grandmother about being sexually abused. The complaint was made at the time S.H. got into trouble for putting inappropriate photographs of a sexual nature on social media. The family did not believe the complaint and no action was taken.

The weekend before S.H. reported her allegations, M.A. became aware that S.H. may be using alcohol and marijuana and had reported this information to the mother. Before the mother confronted S.H. about any use of substances, S.H. requested to spend the summer with her biological father who lived out-of-state. The mother refused the request, causing S.H. to become angry. The mother explained on the morning the allegations of sexual contact were reported, S.H. was still upset with the mother to the extent of crying and screaming. When the mother dropped S.H. off at school, S.H. threatened the mother by stating, "I will make you pay." The child protective worker was unaware of S.H.'s conflict with her mother and threat of reprisal.

S.H.'s allegations also included factual inconsistencies. The most detailed sexual-abuse allegation by S.H. involved an incident alleged to have occurred in the detached garage of the mother and M.A.'s home. S.H. stated the abuse stopped when M.A. heard the front door to the home close. However, the evidence reflects it would be nearly or entirely impossible for a person to hear the front door close while inside the garage.

The mother's testimony also contradicted S.H.'s statements regarding a note allegedly written by T.A. reporting T.A. had been sexually abused by M.A. S.H. stated in the interview that she had thrown the note at the mother sometime before again moving out of the mother and M.A.'s home to go live with her grandmother. The note allegedly supported S.H.'s claim that T.A. had also been a victim of sexual contact. The mother testified she found a note but not until after the forensic interviews were conducted; she found the note in the laundry. She testified she could only make out T.A.'s name and the words "dad" and "touch." She also testified S.H.'s and T.A.'s handwriting is very similar. The note was not admitted into evidence.

At the adjudication hearing, the mother also stated T.A. is easily influenced by S.H. The mother explained there have been incidents in the past when S.H. made promises to T.A. to get T.A. to do something for her. The mother testified T.A. looks up to S.H. and wanted to be like S.H.

The child protective worker acknowledged M.A. was adamant he had had no inappropriate contact with either S.H. or T.A. and M.A. was cooperative. There were no allegations M.A. had inappropriate contact with D.A.

After the allegations of S.H. were reported, M.A. left the family home. The department of human services issued a confirmed child-abuse assessment after investigating S.H. and T.A.'s claims. On May 18, 2017, the children were adjudicated CINA. The court found the statements of S.H. and T.A. to be credible. The court thus determined there was clear and convincing evidence supporting grounds for adjudication under section 232.2(6)(d) as to T.A. and section 232.2(6)(c)(2) as to T.A. and D.A. At the time of the dispositional hearing on June 26, criminal charges were pending against M.A. The court entered the dispositional order on June 27 confirming adjudication and ordering custody of T.A. and D.A. to remain with the mother. M.A. appeals.

**II. Standard of Review.**

Our review of CINA proceedings is de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "In reviewing the proceedings, we are not bound by the juvenile court's fact findings; however, we do give them weight." *Id.* "As in all juvenile proceedings, our fundamental concern is the best interests of the child." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).

**III. Analysis.**

"CINA determinations must be based upon clear and convincing evidence." *J.S.*, 846 N.W.2d at 41; *see* Iowa Code 232.96(2). "Clear and convincing evidence" means "there are 'no serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence.'" *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016) (alteration in original) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)). M.A. contends the State did not establish the

grounds for adjudication by clear and convincing evidence and adamantly maintains he did not sexually abuse S.H. or T.A.

**1. Section 232.2(6)(d).**

Under section 232.2(6)(d), a child "[w]ho has been, or is imminently likely to be, sexually abused by the child's parent" is a CINA.

On our review of the record, we agree there is not clear and convincing evidence supporting grounds for adjudicating T.A. under section 232.2(6)(d). Both the mother and the maternal grandmother indicated S.H. has a history of untruthfulness. S.H. made a previous allegation of physical abuse by the maternal grandmother, which was determined to be unfounded. The mother testified that on the night before S.H. reported the allegations against M.A., S.H. was angry with the mother because S.H. asked to spend the summer with her biological father and the mother refused. M.A had also just told S.H. he was going to tell the mother about S.H.'s substance abuse. The mother explained S.H. was still upset the following morning and did not want to attend school. The mother stated while she was dropping S.H. off at school S.H. said "I will make you pay" and slammed the car door. The same morning, S.H. made her allegation of inappropriate contact. The child protective worker had no knowledge of these facts until the adjudicatory hearing.

Upon being asked, T.A. stated to her mother and separately to the child protective worker she had not been inappropriately touched by M.A. She only became a part of the investigation because S.H. informed the child protective worker T.A. was also a victim. However, after spending time with S.H. before her forensic interview, T.A. did report to the forensic interviewer she had experienced

inappropriate sexual conduct by M.A. The record reveals S.H. has on occasion influenced T.A., who looks up to S.H., and S.H. had the opportunity to influence T.A. before the forensic interview. The mother also testified the note in which T.A. allegedly stated she had been sexually abused was not legible but for the words "dad" and "touch."

These facts all raise serious questions of the truthfulness of S.H. The State's case rested entirely on hearsay—neither S.H. nor T.A. testified at the adjudication hearing. The CPC forensic interviewer also did not testify.[1] Moreover, neither the recordings nor transcripts of the forensic interviews of the children were admitted into evidence. The note supposedly corroborating S.H.'s statement that T.A. was a victim was also not admitted into evidence.

Upon this limited record, the sexual abuse or sexual contact allegations appear to be riddled with discrepancies, inconsistencies, and a motive to be untruthful. Thus, we cannot find there are no serious or substantial doubts as to the evidence supporting the allegations of sexual abuse, particularly when it is clear S.H. was angry and expressed an intent to obtain retribution. For the reasons recited, we conclude there is not clear and convincing evidence T.A. has been or is imminently likely to be sexually abused, and we reverse the court's order finding T.A. a child in need of assistance under section 232.2(6)(d).[2]

---

[1] We acknowledge hearsay statements are permitted in adjudicatory hearings in a CINA case. Iowa Code § 232.96(3), (6); *see In re A.M.H.*, 516 N.W.2d 867, 873 (Iowa 1994).

[2] By our decision today we do not draw any conclusion as to whether any sexual contact occurred, but rather, simply conclude there was a lack of proof. We also do not intimate the State must always present the testimony of the forensic interviewer or admit as evidence an audio or video of the forensic interview. We only conclude here, where the evidence was highly controverted, the limited evidence submitted by the State was insufficient to meet its burden of proof.

**2. Section 232.2(6)(c)(2).**

We also conclude there are no grounds for adjudicating either child a CINA under section 232.2(6)(c)(2). Under section 232.2(6)(c)(2), a child "[w]ho has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child" is a CINA. The State's prosecution of this case, as well as the juvenile court's ruling, was premised upon the evidence attempting to prove M.A. committed sexual abuse or sexual contact. Because we have found the evidence in this respect lacking due to the limited record, we reverse the juvenile court's order adjudicating T.A. and D.A. as CINA under section 232.2(6)(c)(2).[3]

**REVERSED.**

---

[3] We suspect the State may have chosen to withhold use of some of its evidence for the pending criminal prosecution. However, the existence of the pending criminal prosecution does not lessen the State's burden of proof in these proceedings.